# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 09-272 (JMR/JJK) |
| Plaintiff, | |
| v. | |
| 1. Keith James Hubbard, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Michael A. Dees, Esq., Assistant United States Attorney, counsel for Plaintiff.

Andrea K. George, Esq., Assistant Federal Defender, counsel for Defendant.

This matter is before this Court on Defendant Keith James Hubbard's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 13), and Pretrial Motion to Suppress Statements, Admissions, and Answers (Doc. No. 14). This Court held a hearing on the motions on October 23, 2009,[1] and received testimony from one witness, Federal Bureau of Investigation ("FBI") Special Agent Geoffrey Stankevitz. The Court also received one exhibit from the Government, which is the Application and Affidavit for Search Warrant at issue. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.

---

[1] On October 23, 2009, the Court issued an Order concerning various other motions and took Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 13), and Motion to Suppress Statements, Admissions, and Answers (Doc. No. 14), under advisement for submission to the District Court on Report and Recommendation. (Doc. No. 19.)

For the reasons stated below, this Court recommends that Defendant's motions be denied.

## BACKGROUND

Defendant's motions concern the execution of a search warrant at Defendant's residence and the statements that he gave to officers during the search.

On May 1, 2006, United States Magistrate Judge Noel issued a warrant to search a specific location in Eagan, Minnesota, described in the warrant by the specific address for that location. (Hr'g Ex. No. 1.) The supporting affidavit describes the location as Defendant's residence, and describes the house at that location as a tan, single-family dwelling with an attached two-car garage. It also included a picture of the house. The search warrant indentifies the objects of the warrant as instrumentalities, fruits, and evidence of violations of Title 18, United States Code, Section 2252A, specifically listing the following: visual depictions of child pornography or minors engaged in sexually explicit conduct, and any mechanism used for the receipt or storage of the same; computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data; documents, records, emails, and internet history (in documentary or electronic form) pertaining to the possession, receipt or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct, or pertaining to an interest in child pornography whether transmitted or received; records, documents, invoices, notes, and

materials that pertain to accounts with any Internet Service Provider, as well as any records relating to the ownership or use of computer equipment found in the residence; documents and records regarding the ownership and/or possession of the searched premises; and photographs of the searched premises taken during the course of the search.

Magistrate Judge Noel issued the warrant on the basis of probable cause as shown in the Affidavit of Geoffrey W. Stankevitz. Special Agent Stankevitz's affidavit includes: (1) information regarding the specific Internet Protocol ("IP") address 24.245.1.51 obtained through a keyword search for files using the P2P[2] program LimeWire; (2) information received from conducting a "browse host" command, including a list of files that were being offered for download by the IP address 24.245.1.51, some of which were indicative of child pornography; (3) information Special Agent Stakevitz obtained from his review of files downloaded from the IP address 24.245.1.51, five of which Stakevitz believed contained child pornography; (4) information obtained through an Internet tool and a subsequent United States Department of Justice administrative subpoena submitted to Comcast IP Services indicating that Defendant was the subscriber to IP address 24.245.1.51 during the relevant time frame at the specifically described address in Eagan; and (5) information obtained through surveillance

---

[2] Special Agent Stankevitz explains in his affidavit that P2P means peer to peer file sharing, which is "a method of communication available to Internet users through the use of special software" that is "designed to allow users to trade digital files through a worldwide network that is formed by linking computers together." (Hr'g Ex. No. 1.)

that indicated that a vehicle registered to Defendant was located in the driveway of the Eagan address.

At the October 23, 2009 hearing, Special Agent Stankevitz provided the following testimony concerning the circumstances surrounding the search and the statements at issue in Defendant's motions. On May 3, 2006, at about 7:00 a.m., approximately nine law enforcement personnel (including both FBI agents and local law-enforcement officers), arrived at Defendant's residence in Eagan to execute the search warrant. All of the officers and agents were armed, and some of them were wearing uniforms. Special Agent Stankevitz and several other agents went to the front door to knock and announce their presence. Other law enforcement agents were taking up perimeter locations when one of the officers saw Defendant in his backyard. The officer called out to Defendant and asked him to come to the front of the house. Defendant complied and met Special Agent Stankevitz in the driveway.

Once Defendant was in the front of his house, the agents told Defendant that they were with the FBI. Special Agent Stankevitz identified himself and told Defendant that they had a federal search warrant. Agent Stankevitz then asked Defendant if he could talk to him about why the law-enforcement officers were at Defendant's residence. Defendant agreed to talk to Agent Stankevitz. During this time, other agents went through Defendant's home to secure the residence for officer safety reasons (i.e., to make sure there was no danger to the officers who would be conducting the search), and asked the people inside to stay in

4

certain locations in the home so that the agents would know where they were. Specifically, these other agents temporarily detained four adults and three children in the living room until the protective sweep was completed. Special Agent Stankevitz testified that after the protective sweep, the adults were told by the agents that they were free to leave the house and/or go about their business, but that if they were going to stay, they were asked to stay in the living room for officer safety reasons. Agent Stankevitz testified that he did not put this information in his written report, but explained that he only summarizes events in his report and that just because something does not appear in his report does not mean that it did not happen.

While they were outside the house, and after the protective sweep was completed, Special Agent Stankevitz asked Defendant if there was a place in his home that was private and comfortable for a conversation. Defendant led Agent Stankevitz and another agent, Maureen Lese, into the home and down six or seven steps to a room in the home's lower level. The room was approximately nine or ten feet by twelve feet, had windows, and housed a computer-desk area, a television, and two couches. Agents Stankevitz and Lese sat on one couch and Defendant sat on the other couch across from the agents. At the time, Agent Stankevitz was wearing jeans or pants, body armor, a shirt over the body armor, and a jacket that clearly identified that he was with the FBI. Defendant was not handcuffed.

5

Prior to starting the interview, Agents Stankevitz and Lese told Defendant that they were at his residence to execute a search warrant and that Defendant was not under arrest. The agents told Defendant that he would not be arrested at any point in the day and that no one else in the home would be arrested. Special Agent Stankevitz told Defendant that he would like to speak with him about why they were there with the search warrant if he was willing. Agent Stankevitz told Defendant that he did not have to talk to the agents if he did not want to, but that if he did talk with them, he could stop talking to them at any time. Defendant again agreed to talk with the agents. Agents Stankevitz and Lese then interviewed Defendant for approximately 45-60 minutes.[3] The agents did not provide a *Miranda* warning prior to their questioning. Special Agent Stankevitz described Defendant's demeanor during the interview as polite, cordial, and cooperative. According to Agent Stankevitz, Defendant did not refuse to answer any of the questions asked of him during the interview, and he answered the agents' questions appropriately and completely. Agent Stankevitz also testified that he was truthful with Defendant during the interview, he did not promise Defendant anything for talking with him, and he did not threaten Defendant in any manner in order to get him to speak. At one point during the interview, Defendant's dogs came into the lower level and were being hyper and friendly. At that point, Defendant got up and took the dogs out of the room. No

---

[3] While Agents Stankevitz and Lese interviewed Defendant in the residence's lower level, other agents took pictures of the home and then executed the search warrant in other areas of the home.

agent accompanied Defendant when he left the room, however Agent Stankevitz agreed that an agent would have been watching Defendant at all times. Agent Stankevitz testified that Defendant would have had access to a telephone or the use of the bathroom, but that Defendant did not request either. At no time during the interview did Defendant ask to terminate the interview, ask for a lawyer, or state that he no longer wanted to talk to the agents.

After the interview, Agent Stankevitz and Lese told Defendant that he was free to do whatever business he needed to do. They told him that if he wanted to leave, he could leave, but they did ask that if he stayed in the house, which was still being searched, that he sit in the living room with the rest of his family. Special Agent Stankevitz explained at the hearing that the purpose for this request was to help the agents control the scene better. At that point, Defendant went upstairs to the living room and the other agents came downstairs to continue the search there. The execution of the search warrant continued for another hour or hour and a half after Agents Stankevitz and Lese completed the interview with Defendant. After the execution of the search warrant, Special Agent Stankevitz discussed the list of items that were taken pursuant to the search warrant with Defendant, and then the officers left. Defendant was not arrested at that time, nor was anyone else who was present in his residence.

Defendant was subsequently indicted for Distribution of Child Pornography in violation of Title 18, United States Code, Sections 2252(a)(2) and 2252(b)(1),

7

and Possession of Child Pornography in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and 2252(b)(2).

## DISCUSSION

### I. Motion to Suppress Evidence

Defendant challenges the search warrant issued in this case on the ground that the four corners of the supporting affidavit failed to establish probable cause. Based on this challenge, Defendant moves to suppress the physical evidence seized from his Eagan residence.

Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 236). When determining whether probable cause exists, a court does not evaluate each piece of information independently, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or

evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004).

In reviewing the decision of the issuing court, this Court must ensure that the issuing court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238-39). Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

Upon reviewing Special Agent Stankevitz's Application and Affidavit for Search Warrant in its entirety, the Court finds that it established probable cause for the search warrant. As set forth above, this Court's role is simply to "make a practical, common-sense decision" about whether there is a "fair probability" that officers will discover contraband. *See Gates*, 462 U.S. at 238. The search-warrant applications stated, among other things, that: (1) some of the file names that were being offered for download from the IP address 24.245.1.51 were indicative of child pornography; (2) image files were downloaded from the IP address 24.245.1.51, and at least five of those image files depicted what Special Agent Stankevitz believes to be child pornography; and (3) information received from Comcast IP Services indicates that Defendant was the subscriber to IP address 24.245.1.51 during the relevant time frame at his residence in Eagan.

All of the above-referenced information establishes a fair probability that instrumentalities, fruits, and evidence of violations of Title 18, United States Code, Section 2252A, would be found in Defendant's home.

Therefore, the evidence seized pursuant to the search warrant for the specifically identified location known as Defendant's residence, including the residential dwelling and any computer and computer media located therein where the instrumentalities, fruits, and evidence of violations of Title 18, United States Code, Section 2252A might be found (Hr'g Ex. No. 1), was not unlawfully obtained in violation of Defendant's constitutional rights. The search warrant was based on sufficient probable cause as stated in the Special Agent Stankevitz's Affidavit and as determined by United States Magistrate Judge Noel.[4] The warrant properly and sufficiently identified the location of the search and the items to be seized. The search warrant in this matter was lawfully issued, and

---

[4] Even if probable cause did not exist, there was a facially valid warrant and the good faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). Here, this Court concludes that the good-faith exception would apply. There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officers' reliance was not reasonable.

there is no requirement for suppression of evidence seized pursuant to the warrant. Therefore, this Court recommends that Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 13), be denied.

II. **Motion to Suppress Statements**

Defendant contends that any statements he made in his residence on May 3, 2006, should be suppressed because the statements were taken in violation of his Fifth Amendment right against self-incrimination and were not made after a valid waiver of Defendant's rights pursuant to *Miranda*.

As a preliminary matter, the Government states that it does not intend to use any incriminating statements made by Defendant after his arrest. Regarding the pre-arrest statements made by Defendant on May 3, 2006, during the interview in the lower level of his residence, the Government asserts that the statements were non-custodial, and that Defendant offered them knowingly and voluntarily.

"[P]olice officers are not required to administer *Miranda* warnings to everyone . . . they question." *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Rather, *Miranda* warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way[.]'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)); *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984); *United States v. Helmel*, 769 F.2d 1306,

1320 (8th Cir. 1985). Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning. *See Miranda*, 384 U.S. at 473.

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (further quotations omitted). A list of common indicia of custody that has been identified by our Court of Appeals includes the following:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
> (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see also United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005). These factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir.

2005). Instead, the *Griffin* factors serve as a guide in the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 827.

Whether or not *Miranda* is implicated, the Supreme Court has recognized that, in order for a confession (or incriminating statement), to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's protection against self-incrimination. *See Dickerson v. United States*, 530 U.S. 428, 433-34 (2000) (stating that the Supreme Court applies the due-process-voluntariness test). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Id.* at 434. A statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001) (quotations omitted).

Whether a defendant's will has been overborne is determined by an examination of the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure. *Brave Heart*, 397 F.3d at 1040. Some factors this Court may consider in evaluating the totality of the circumstances include: the youth of the accused; the level of education of the accused; the lack of advice to the accused on his constitutional rights; the length of the detention;

13

the repeated and prolonged nature of the questioning; and the use of physical punishment.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Brave Heart*, 397 F.3d at 1041 ("[O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices . . . . None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation cause the defendant's will to be overborne.") (quotations and citation omitted).  The government bears the burden of proving voluntariness by a preponderance of the evidence.  *Brave Heart*, 397 F.3d at 1040.

Here, Defendant has moved to suppress the pre-arrest statements that he made on May 3, 2006.  Defendant argues that looking at the totality of the circumstances, he was in custody because nine armed agents, according to a plan, converged in his home early in the morning, and gathered his family members in the living room, all of which created a police-dominated environment.  The Government does not dispute that the agents initiated the contact with Defendant on that day and that Defendant was not provided with a *Miranda* warning prior to the interview.  The pertinent inquiry is, therefore, whether Defendant was in custody, and, if he was not, whether his statements were otherwise involuntary.  This Court finds that the totality of circumstances compels the conclusion that Defendant was not the subject of custodial interrogation on

May 3, 2006, that *Miranda* warnings were not required, and that Defendant's statements were voluntary.

According to the uncontroverted testimony, Defendant let the agents into his home and led them into a room in the lower level to talk, neither Special Agent Stankevitz nor Agent Lese gave Defendant a *Miranda* warning, and Defendant answered the agents' questions. When they were outside the house, Special Agent Stankevitz told Defendant that he would like to talk to Defendant about why the agents were conducting the search and Defendant agreed to talk to the agents. Defendant chose the room in his house where the interview occurred and escorted the agents in to the room. The agents told Defendant prior to starting the interview that he was not under arrest, that he would not be arrested at any point in the day, and that no one else in the home would be arrested. Special Agent Stankevitz also told Defendant that he did not have to talk to them if he did not want to, but that if he did talk with them, he could stop talking to them at any time. Agent Stankevitz's testimony indicates that after providing Defendant these statements, Defendant was willing to speak with the agents. The uncontroverted testimony indicates that Defendant was free to leave and that the agents did not tell Defendant anything that was not true or make any promises to Defendant in order to get him to answer questions.

Strong evidence of restraint of freedom of movement is required to overcome the natural inference that questioning is non-custodial when the defendant is questioned in the familiar surroundings of his own home, is advised

that he is free to leave, and is not arrested at the conclusion of the interview or the search. *Czichray*, 378 F.3d at 830. Here, although the agents initiated the contact, Defendant voluntarily allowed the agents into his home and answered the agents' questions. There is nothing in the record to suggest that the agents restrained Defendant's freedom of movement in any way, and there is no evidence that the agents employed any deceptive stratagems, strong arm tactics, or even raised their voices, at any time during the interview.

The interview took place in the comfort of Defendant's home, rather than inside a law-enforcement building, which tends to show that the atmosphere of the interview was not police-dominated. *See Beckwith v. United States*, 425 U.S. 341, 342-43, 345-46 (1976) (finding no custody when defendant was interviewed by two IRS agents at the dining room table of a private home where he occasionally stayed). Although an interview with the FBI about a person's possible participation with child pornography is unlikely to be relaxed conversation, it is undisputed that there was a cordial atmosphere here as shown, for example, by the fact that Defendant's dogs roamed into the room, ran about, and were then removed by Defendant. And the interview was conducted in approximately 45-60 minutes, which is not unduly long. *See Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (stating that a seven-hour interview was not per se unconstitutional). Only two agents participated in the interview, although others were executing the search warrant. Also, Defendant was not arrested at the end of that interview. *See United States v. LeBrun*, 363 F.3d 715, 722 (8th

Cir. 2004) (stating that the lack of arrest is a "very important factor weighing against custody"). In addition, the record reflects that the agents informed Defendant of his right to terminate the interview, and that he was thereafter cooperative. See *Czichray*, 378 F.3d at 830 ("Where a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial.") Defendant has provided no rebuttal evidence showing that he was intimidated to participate in the agents' questioning by any acts or statements of the agents. And the record does not reflect that Defendant asked the officers to stop their questioning, to leave his home prior to the end of the interview, or to stop asking any particular line of questions.

Furthermore, the Court finds no grounds to conclude that the existence of certain circumstances inherent to the execution of a search warrant (i.e., gathering Defendant's family members into one room to ensure a secure scene and officer safety), can properly be equated to indicia of custody. Although the sudden appearance of numerous agents wearing FBI jackets at one's home is obviously intimidating, this circumstance is typical of a search-warrant execution. Essentially this circumstance relates to nuances of whether there was a police-dominated atmosphere, use of deception and strong-arm tactics, and voluntary acquiescence to an interview. Here, the sudden arrival of FBI agents simply

17

does not outweigh the objective, undisputed facts that indicate the absence of a custodial situation. *See Czichray*, 378 F.3d at 828. Keeping the family members in the living room during the initial security sweep and then asking them to remain in the living room if they were going to stay in the house after the sweep is not indicative of Defendant's custody, but rather is simply the cautious—and reasonable—conduct that would be expected in the execution of a lawful search warrant in a private residence. Therefore, after considering the *Griffin* factors, this Court concludes that Defendant was not in custody during the interview with the agents on May 3, 2006, and suppression of Defendant's statements based on the failure to advise him of his *Miranda* rights is not required.

Even in the absence of a custodial interrogation, the Court must also determine, consistent with the requisites of the Fifth Amendment, whether the statements given by Defendant were voluntary, or whether they were the product of an overborne will. Based on the record presented, this Court finds no evidence to reflect that Defendant's statements were involuntary, or that there were any specific instances of coercion. The record reflects instead that the interview was the product of Defendant's own decision to cooperate with law enforcement. The length of the interview was not unduly burdensome, the Defendant was within the comfort of his own home, and he was not tricked into lending cooperation to an investigation that he was otherwise resisting. Moreover, Defendant does not assert the existence of any physical or mental impairments that would impact the voluntariness analysis. Accordingly, viewing

the totality of the circumstances, this Court finds that Defendant's will was not overborne and the statements that he made during the May 3, 2006 interview were voluntary. Therefore, Defendant's motion to suppress the May 3, 2006 statements should be denied.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 13), be **DENIED**; and

2. Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers (Doc. No. 14), be **DENIED**.

Date: November 24, 2009

                                        *s/Jeffrey J. Keyes*
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 9, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.